Good morning, Your Honor. Poor emblem for the Alto family appellants in this case. I understand that you want to be reminded after five minutes you're sharing time with co-counsel. We're dividing the time. We're also dividing the issues because she's better at the research than I was. And she's going to talk about, my colleague's going to talk about Rule 76 and the issue of res judicata. All right. And I'd like to address the issue of Larry Echo-Hawk's opinion, the decision, and the court below on the issue of the facts of the case and the fact-finding portion of it. And I think it's particularly interesting what Judge Irma Gonzalez had to say in Alto I. That was Alto v. Black and her opinion of how Larry Echo-Hawk had reached his conclusions. And I was pretty surprised when we got a different result with the next judge because Irma Gonzalez did, in fact, retire in the meantime. But this was a three-to-two decision by the Enrollment Committee to disenroll the Alto family. By the way, many of my clients are in the courtroom today. I have one of the persons who objected to the disenrollment was a professor at Cal State University, Robert Phelps. And he's a Ph.D. of history. And he advised the committee that they need to use a higher standard if you're going to disenroll, that they should not be disenrolling on a preponderance of evidence, that they should use a much higher standard because of issues that were at stake and basically the vested rights of this family. He voted against it, and coincidentally, he was also the vice chair of the tribe at the time. So you would think it would have a lot of weight, but that's on the tribe side. On the agency side, when Larry Echo-Hawk says in his opinion, as a matter of law, the federal government must apply a more stringent standard to Enrollment Committee recommendations to disenroll tribal members. He should use a higher standard. He excerpts a record 210. However, Echo-Hawk then ignored the statement and applied the lowest standard by a preponderance of evidence. And Judge Gonzales did not like the way he did it. And I'd just like to reach a few of those comments because my time is going to be short here. But Judge Gonzales criticized Echo-Hawk on the issue of the early census, stating that the plaintiffs raised serious questions as to the probative value of the censuses, listing inaccurate and inconsistent ages for the individuals surveyed, 1907 to 1913. Now, we're talking 110 years ago or so. They do not appear to be trustworthy. Then she says Hawk's rejection of this inconsistency is not reasonable. That's at ER 118. She goes on to say about the affidavits when she entered a preliminary injunction in this case. She criticized Echo-Hawk's reasoning, stating it was conclusory and not supported by the evidence. And the issue on that discussion of the affidavits is whether or not Marcus Alto was a Native American, a member of the tribe. On the baptismal certificate, which I think is probably the easiest issue that we can look at, is a 1907 baptismal certificate that named the child as Robert Marco Alto, but named the father as Jose Alto. And Jose Alto was on the 1910 census, which was important to the tribe's formation, as was his wife, Maria Duro. The witnesses to the baptismal record were an Alto and a Duro. And the tribe said that they correctly identified the Jose Alto in question as being the father of this child, and that therefore the child must be Marcus, Marcus, M-A-R-C-U-S. I wonder if I could ask you a question. It seems to me this case boils down to, when all is said and done, who gets to decide who's a member of the tribe? Is it the tribe or is it the federal court? Who gets to decide this? What I've been struggling with, as long as there is some evidence to support what the tribe has done, if they don't just flip a coin or the equivalent, if there's some basis for what they've done, don't they get the last word on who's a member of their own tribe? It's just a matter of tribal governance? Thank you, Your Honor, for that. My colleague is going to address that issue in more depth, but indeed they have, and all the issues that have been brought before the tribunals has been that the agency, the Bureau of Indian Affairs, has the final call on that. And that was a gift, I guess, to the government and to this family in particular, that in fact those that are, by disenrolling my clients, this family, they're increasing their own paychecks because they get paid from that casino on a per capita basis. So when they throw 54 people out, all their paychecks go up. So there's a strong reason to look at the biases behind trying to eliminate. The other issue that came into play during that part was that my clients had sent their children to college and they were rising up in the power within the tribe and sitting on boards and panels. So the things that go on in the tribe involve those kind of challenges, too, political challenges. But I'd particularly like to say about... You're into your co-counsel's time. Good morning. I'd like to address that issue with you. Trace the emblem on behalf of the Alto family. I'd like to address that issue. I think in Alto v. Black, the Court of Appeal, the Ninth Circuit, another panel, had said that the tribe gave the final decision to the Bureau and that final decision to determine membership. So in this case, it's a little different than the other membership cases that you've seen before. If you look at Alto v. Black, and that's... I don't have the site on it right now, but it's a 2013 published decision. It says that they gave up that right to the final government to make the final decision. And what I want to talk about to you is... I'm sorry, I want to make sure I understand how this works. I had the impression that the Bureau of Indian Affairs reviewed what the tribe did to make sure that there was evidence to support its ruling, not that they in effect reviewed it de novo. Am I right about that, or do I have a misunderstanding of that? Misunderstanding. In this case, under the governing documents, the band gave up the right to the Bureau, to the Assistant Secretary, to make a final decision in this case. And that's already been resolved. A de novo decision, or just to review whether the tribe had evidence to do what it did? De novo. He has to approve disenrollment. He has to say, you've got evidence here enough to disenroll this family. So it's a de novo review. It's the final agency decision. It's not something where they just have to take the band's recommendation in this case. And it was already determined in Alto v. Black that it's the Assistant Secretary that has the final decision in this case. That's why a preliminary injunction was issued in this case. Well, they get the final decision, but that's not what I'm getting at. Is the final decision that, yes, the tribe's enrollment committee had evidence to support it, or do they say, we don't care what the tribe committee did, I get to look at it all over again and start from scratch? Let me explain to you the history. Back in 1987 was when they made this original application for enrollment. And under the governing documents, the Assistant Secretary, it was the secretary at that time, but it was delegated to the Assistant Secretary, had the right to make a final and conclusive decision. That is what was done in this case. In 1995, Assistant Secretary Ada Deer, under Part 76, made a final and conclusive decision on my client's membership and right to membership in this band. That final and conclusive decision was not appealed by the band, and they could have gone into district court, they could have asked for reconsideration. They enrolled all my clients in the band under Part 76, and they've become tribal members since then under Part 76. So the issue before the court is whether Echo Hawk could even revisit this decision or not, because there was already a final and conclusive agency decision on the same facts. But it was final in the sense that if no new evidence came forward, then there would be no basis for disturbing it, right? But that other provision, I don't have the number in front of me, but it's that sub for Part D, I think, of 4814, maybe. Your Honor, 4814 does not apply. Okay, well, there's a comparable provision in 76. Yes, and I would like to address that with you, because 4814... Thank you. So all I was going to ask you is that you've raised res judicata as a defense, and it cannot possibly be the case that when you say, when it says final and conclusive, that it means it can never, ever be revisited again. It's subject to either whichever one of these provisions you want to pick that says if there is, you know, new evidence that postdated the 1995 decision that called into question the accuracy of information that was used to make the first decision, right? If you take the whole Part 76 as a whole, you have to read that ordinance as a whole. And in that ordinance, it says final and conclusive. And if you take the word final, that would be fine, but the word final and conclusive in 76.14 means conclusive, putting an end to everything. As long as no new evidence surfaces that calls into question the accuracy of the information on which the earlier decision was based. Otherwise, you've read out of the Constitution that other provision, haven't you? No, you haven't. Okay, so when under your reading of final and conclusive would that other provision ever get triggered? It would get triggered to other tribal members, Your Honor. I wanted to lodge with you, there's three subsequent roles after my clients have been enrolled under Part 76.4. So they've enrolled a lot of other tribal members besides my clients under Part 76. Okay, so that's when it would get triggered. It would get triggered to other tribal members who have not gone up to the highest agency in a fact-finding role and had their case adjudicated in a final and conclusive decision. Can I just ask, I had a question when I was reading Alto v. Black, which says that the 1960 regulations, I think that's 48.1 to 48.15, are the applicable regulations, and it says the parties agree to that. So what do we do about that? Aren't we bound by that aspect of the decision? No, because you have to review the assistant secretary's application of tribal law, de novo, in this case. But aren't we bound by our precedent, which says that the applicable law is the 48.1 to 48.15, which is incorporated in the Constitution? Well, it wasn't until, it doesn't, in Part 76, in the published portion that I've always seen, this record is over 4,000 pages. And it didn't have this provision that we cited to in page 586 of the record. And this was in the agency, and Echo Hawk didn't even discuss this fact. And what it says is that the band adopted, by a vote of 33-4 and three against, to apply this as their new enrollment ordinance, Part 76. So Part 76 was re-delegated, it used to be Part 48, but Part 76 was re-delegated from Part 48. In fact, the band couldn't, they've been operating all the time under Part 76, and they've enrolled, in 1998, in 2002, and 2006, they've enrolled other members under Part 76. I just want to save some time for rebuttal. I do. A minute and 30 seconds now. I do. So in this case, they're operating under Part 76. Mr. Mass brought his challenge under Part 76, and the Enrollment Committee said Part 76 was what you should bring this enrollment challenge under. And Part 76 says, is what our clients were enrolled under. So you've got to look at that statute as a whole, and you've got to say final and conclusive. And conclusive means putting an end to all inquiry. And you've got to look at that statute together, the whole Part 76. Thank you. May it please the Court. John Arbab for the Federal Appellees. Could I just make a comment about Ms. Emblom's emphasis on final and conclusive? I think that, for better or for worse, the term final and conclusive is sort of like the term null and void in the law. And, in other words, the and void doesn't really add anything to the word null. In this situation, the word and conclusive doesn't really add anything to the word final. And I think it's also noteworthy that both Secretary Deere and her decision, and Secretary Echohawk in his decision, just said my decision is final for the Department. It's true that the regulation itself does have the extra words and conclusive, but I don't think they really have much operative force, and certainly not they don't bear the weight that the plaintiffs are placing on that term. I think Judge Watford quite correctly pointed out that 48.14d does allow reopening of final and conclusive decisions when you do read the regulation as a whole. So I think the real issue here is does substantial evidence support Mr. Echohawk's determination on the merits? And if I could address one other point that came up earlier, the standard that Echohawk used was that the Enrollment Committee's recommendation had to be supported by a preponderance of evidence, otherwise he would not accept it. The Enrollment Committee was arguing for a much more lenient standard. In other words, that Echohawk had to accept the recommendation unless it was clearly erroneous. But the Assistant Secretary rejected that, in effect giving a more plaintiff-protective burden of proof placed on the tribe. Nonetheless, he found that there was ample evidence in the record before him to support the recommendation of the Enrollment Committee. And so... Can I ask you a process question in terms of how this, how the review would work for Assistant Secretary, is it Echohawk? Yes. I mean, you would agree, I gather, that if no new evidence surfaced at all, that the Assistant Secretary couldn't come along in 2011 and just say, you know what, I feel like taking another look at this and I'm going to weigh the conflicting evidence and come out differently from the way Assistant Secretary Deere did, right? That would not be permitted under this provision, correct? Your Honor, I think that would be a much closer question. It's not this case. As you pointed out earlier, the operative language of 48.14d, the standard is, was the earlier enrollment based on information subsequently determined to be inaccurate? Right. So that suggests there's got to be something new that's thrown into the mix, right? I would think that, yes, in probably the vast majority of cases that is true. And there was new evidence here. Okay. But that was the process question I had. So you get one new declaration from somebody that wasn't available or that wasn't submitted to the Assistant Secretary back in 1995. You throw that into the mix and then Assistant Secretary Echohawk can just re-weigh all of the evidence that Assistant Secretary Deere already spent a long time combing through? Is that how it works? No, that's not how it works, Your Honor. Well, that's certainly not how it worked in this case. There was far more than just one new affidavit. Oh, no, no, no. I know. But as a matter of process, all I'm asking is once something new is thrown into the mix, then can the Assistant Secretary in the subsequent review basically re-weigh everything because that subpart D provision was triggered? Is that how it works? I'm not talking about this case. Well, the Assistant Secretary would have to come to a determination that the inaccuracy, inaccurate information standard had been met. And if all you're talking about is one new declaration, otherwise just a rehash of the same old evidence, then I can't, it would be very, very unlikely. Okay. But so the information that supposedly was called into question in terms of its accuracy by these new declarations that were submitted was whether Marcus Senior, I might be getting the names wrong, but I think whether Marcus Senior was the natural, was the son of, is it Maria? Yes. It's of the mother, right? Whether he was actually her son or adopted. Yes. So these declarations do speak to that issue, right? They say, I mean, because the earlier decision had to be based on the fact that Marcus Senior was the son of, is Maria the right name? Maria, Maria Duro Alto. Right. And that information was subsequently determined to be inaccurate. Not, Your Honor, just based on the new declarations, but on other evidence. Well, but that's what I'm saying. Then I read through Assistant Secretary Echo Hawk's decision and he's basically, other than these new declarations, it seems like he's just plowing through the same ground that Assistant Secretary Deere did. No, Your Honor. If I could, I think I can throw some light on that. In addition to the new declarations, which incidentally were unrebutted before Mr. Echo Hawk, another piece of new evidence was the 1907 baptismal certificate, which if you agree, as he, as Echo Hawk found, and I don't really think that's challenged seriously, if you accept that the 1907 new, newly discovered baptismal certificate is that of Marcus Alto Senior, that document throws into great doubt whether Maria was his natural mother, because it lists a different person as mother. It lists Benedita Barrios. But also, Your Honor, bear in mind that the early San Pasqual BIA censuses from 1907 through 1913, those were not before Secretary Deere. She made no mention of them. And those were also something that Echo Hawk found to be highly probative, because when you look at those censuses, Jose, Maria, and Frank Alto, son of Jose, are listed consistently on those censuses, but Marcus is not. How do we know those censuses weren't before Assistant Secretary Deere? Is there some record of the entire pile of material that she reviewed? Yes, there are two ways that we know that, Your Honor. One is that she was quite careful to enumerate what she was relying on, and this was not mentioned in her 1995 decision. But also, as counsel mentioned, there is a very lengthy administrative record of many thousands of pages that Echo Hawk was faced with here, and when you look at the materials that were presented to Deere in the administrative record, the censuses are not amongst the materials that were presented to her. The same with the two Frank Alto letters from 1910, which Echo Hawk found were highly probative. Those further suggest or support the conclusion that Marcus was adopted, because in those letters, way back in 1910, when we know that Marcus was alive and living with the family, Frank, who's Jose's son, said, the members of my family, and he's responding to inquiries from BIA officials who are trying to compile the census for 1910. He's saying my family members are as follows. He lists Marcus, he does not list Marcus, he says Jose, Maria, and I think one other person, but no mention of Marcus. So again, Echo Hawk found reasonably, it's not arbitrary and capricious, it's supported by substantial evidence, found that this is another indication that at the time, back in 1910, the family understood that Marcus was not a member of the tribe, he was adopted, and that's why we, the family members, are not reporting him to be included on the census. These early censuses were very important, because the whole purpose of them, as Echo Hawk pointed out, was to identify who really was a member of the band, for purposes of acknowledging the tribe and extending to the tribe the recognition or the benefits that flow from the federal government to tribal members. So... Mr. Arbat? Yes, Your Honor. I wonder if you could clarify for me what the Assistant Secretary's role is here, what is his review of what the Enrollment Committee or what the tribe does? Could you clarify that for me? Certainly, Your Honor, and this is fleshed out to some extent in ALTA I, the first appeal, but essentially under the Part 48 regulations, and also under the Part 76 regulations, for that matter, which don't apply, the band only makes a recommendation to the Assistant Secretary. The Assistant Secretary has the final say, as it were, the final approval or disapproval authority. He can either affirm or reject the tribe's recommendation as to an enrollment or disenrollment, and that's what Echo Hawk did here. He took the recommendation, applied a higher standard than the tribe was arguing for, and nonetheless found that on the record before him there was ample evidence to support the disenrollment. And so ultimately the question here, as I was saying earlier, was is that supported by substantial evidence? Just bear in mind that this is an Administrative Procedure Act case. The court has a limited review function. The finder of fact was Mr. Echo Hawk, and the only question is did he act arbitrarily and capriciously in coming to that conclusion that Marcus was adopted, or is that finding supported by substantial evidence? And for the reasons we've detailed in the brief, there is substantial evidence. I mean, the classic formulation, I think, of what is substantial evidence is it needs to be more than a mere scintilla, but less than a preponderance. And here I think that test is pretty easily met. The plaintiffs certainly think that the trier of fact or the finder of fact should have come to a different conclusion, and maybe arguably a reasonable fact finder could have come to the opposite conclusion, but that doesn't mean that the decision that Echo Hawk reached was unsupported by substantial evidence or otherwise arbitrary or capricious. In your view, does it make a difference if 4814 or Part 76 is the controlling rule, and also explain why we aren't bound by Alto v. Black saying that Part 48 is the controlling rule? Well, Your Honor, I think essentially the court is bound by that. As you pointed out earlier, all parties agreed that Part 48 applies, and that was the assumption that the court used in the first appeal to find that, contrary to the band's argument in the first appeal, that the district court had jurisdiction to even entertain the case and jurisdiction to enter preliminary relief. But as to your other question, Your Honor, I think it doesn't make any difference. As we point out in the brief, even indulging the erroneous proposition that the revised Part 76 regulations apply, those regulations have a counterpart to the reconsideration rule in 48.14d, and you find that at Part 76.4b, I believe it is. We cite it in the brief. The language is slightly different, but it's the same principle, that if the enrollment was based on information later determined to be inaccurate, the person's name can be stricken from the role subject to the approval of the assistant secretary. So I think despite all the ink that the plaintiffs have spilled on this question, the premise is erroneous, but even if it were correct, it wouldn't help them. So I think it's really as simple as that. I see I have a little bit of time left, but if there are no further questions, I would just ask that the judgment be affirmed. Thank you. I'm going to take four minutes and leave one minute for Mr. Amblom. You're going to take what? Four minutes of our five-minute session. You only have a minute left. I only have a minute left. Okay. Well, the reason you can go ahead from Alto v. Black and apply Part 76 is because review, you have to look at the whole record, and in the whole record, it shows that Part 76 was adopted by the ban in 1986. That was a piece of evidence that was not before the district court, and the agency didn't cite that piece of evidence in the record. And you've got to review the whole record as far as evidence that supports the agency decision and that record that detracts of it. As far as applying raised judicata in this case, it's proper to apply raised judicata in this case. The Interior Board of Indian Appeals has applied raised judicata in similar cases, and that's at Dawson v. Specific Regional Director 46, IBIA 209, 212, and 213. It's a 2008 decision. They apply raised judicata to agency decisions. Why should you apply it? Because this is a final and conclusive decision. Why do you apply Part 76? Because that is the governing statute. As I suggested, the challenge itself was brought under Part 76, and that's in the agency record itself. How do you respond, though, to your opponent's point that Part 76 has the exact same provision? It does have, because I responded that, yes, it does. And the way you have to read that whole ordinance, that's what the Cotto case says that we've cited in our brief. You have to read that whole Part 76 in a whole, and it says final and conclusive. And it has another provision that allows for reconsideration in certain circumstances. Okay, but if you read that, then you're not reading that other, the word conclusive. You want us to read the final and conclusive and just stop there and not read the rest of it. And I think we're following the rule you want us to follow, and I think that means you have to give effect to that other provision, don't you? Well, you have to give effect to the word conclusive also, not just the word final. This is not just null and void. Final has an interpretation for final decisions, and conclusive has another meaning. You've got to apply that dictionary meaning, because every word in that statute, they drafted the statute, has a meaning. And conclusive means conclusive. In 1995, Ada Deer said, hey, this is it, and it's conclusive. And the band felt it was conclusive, and they went all these years. And taking what you asked the government's counsel, every other year they'd be able to bring something new. They'd say, we've got another new piece of evidence. You've got to be able to apply res judicata at some point. In this case, Judge Gonzalez found that there was not only res judicata issues, but there's collateral estoppel issues that the assistant secretary should have considered.  Twice regional said enroll the Altos, it went up to the assistant secretary. So he overturned Ada Deer's decision and two regional decisions in disenrolling my clients who have been Native Americans. He took away their culture, their identity. He took away everything by disenrolling them and saying that their ancestor was a Mexican and not a Native American. They have been known as Native Americans since 1920 when they were on the U.S. census and 1933 when they were on the California judgment rolls. Thank you. The case of Alto v. Jewel is submitted, and we're adjourned for this session.
judges: Silverman, Ikuta, Watford